# United States Court of Appeals for the Federal Circuit

---

**FISHERMEN'S FINEST, INC., FISHERMEN'S FINEST HOLDINGS, LLC, NORTH PACIFIC FISHING, INC., U.S. FISHING, LLC, AMERICA'S FINEST FISHING, LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-2326

---

Appeal from the United States Court of Federal Claims in No. 1:20-cv-01061-MBH, Senior Judge Marian Blank Horn.

---

Decided: February 8, 2023

---

SVEND BRANDT-ERICHSEN, Nossaman LLP, Seattle, WA, argued for plaintiffs-appellants. Also represented by BRIAN FERRASCI-O'MALLEY.

BORISLAV KUSHNIR, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also

represented by BRIAN M. BOYNTON, ELIZABETH MARIE HOSFORD, PATRICIA M. MCCARTHY.

————————

Before MOORE, *Chief Judge*, DYK and CHEN, *Circuit Judges*.

CHEN, *Circuit Judge*

This case involves commercial fishing within the United States' Exclusive Economic Zone[1] (EEZ). Fishermen's Finest, Inc.; Fishermen's Finest Holdings, LLC; North Pacific Fishing, Inc.; U.S. Fishing, LLC; and America's Finest Fishing, LLC (collectively, FFI) appeal a decision by the United States Court of Federal Claims (Claims Court) dismissing their Fifth Amendment takings claim for lack of a cognizable property interest in certain fishing endorsements, licenses, and permits, separate from or appurtenant to their fishing vessels. Because (i) our precedent establishes that fishing permits and licenses issued pursuant to the Magnuson–Stevens Fishery Conservation and Management Act (the Magnuson–Stevens Act) are revocable privileges, rather than compensable property interests, *Conti v. United States*, 291 F.3d 1334, 1341–42 (Fed. Cir. 2002); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1373–76 (Fed. Cir. 2004); (ii) subsequent amendments to the Magnuson–Stevens Act and the National Marine Fisheries Service's (Fisheries Service) regulations did not then create compensable property rights in fishing permits or licenses; and (iii) there is no inherent right in vessel

———————

[1]    The EEZ consists of a zone extending 200 nautical miles from the baseline from which the breadth of the United States' territorial sea is measured. Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983); *see also* 16 U.S.C. § 1811(a) (1992).

ownership to fish within the EEZ, *Am. Pelagic*, 379 F.3d at 1382–83, we *affirm*.

## BACKGROUND

### A. Statutory And Regulatory Scheme

Congress enacted the Magnuson–Stevens Act in 1976 as part of "[a] national program for the conservation and management of the fishery resources of the United States." 16 U.S.C. § 1801(a)(6) (1976). "Congress explicitly assumed sovereign rights and exclusive fishery management authority over all fish in the EEZ[, which] indisputably encompasses all rights to fish in the EEZ." *Am. Pelagic*, 379 F.3d at 1378 (internal quotation marks omitted); *see also* 16 U.S.C. § 1811(a) (1994) ("[T]he United States claims, and will exercise in the manner provided for in this chapter, *sovereign rights and exclusive* fishery management *authority over all fish . . .* within the [EEZ]." (emphases added)). The Magnuson–Stevens Act's plain language indicates that no claim or entitlement to compensable property rights are conferred with fishing privileges issued thereunder. 16 U.S.C. § 1853(d)(3)(D) (2000) ("An individual fishing quota or other limited access system authorization . . . *shall not create*, or be construed to create, *any right, title, or interest* in or to any fish before the fish is harvested." (emphases added)); *see also Am. Pelagic*, 379 F.3d at 1379 ("[T]here is no language in the statute to the effect that any fishing privileges that are granted pursuant to the Magnuson[-Stevens] Act vest in their owners a property right protected by the Fifth Amendment."); *Conti*, 291 F.3d at 1342 n.6 ("[T]he language certainly suggests that since the permit does not confer any cognizable property right to harvest fish, the [Magnuson–Stevens Act] creates no property right in the permit.").

The Fisheries Service regulates fisheries in the EEZ. *See N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008). Pursuant to the Magnuson–Stevens Act, the Fisheries Service has promulgated regulations, having

the force and effect of law, that establish various licensing and permitting requirements to govern fishing activities in the Gulf of Alaska (GOA) and the Bering Sea and Aleutian Islands (BSAI) management areas (collectively, Management Areas). *See* 50 C.F.R. § 679.1 (1996); 50 C.F.R. § 679.4 (2021); *see also Conti*, 291 F.3d at 1336 (citing 16 U.S.C. §§ 1854–1855 (2000)); 16 U.S.C. §§ 1854–1855 (2012).

In 2007, Congress amended the Magnuson–Stevens Act to expand on then-existing individual fishing quotas by establishing national criteria for quota-based fishing programs, known as limited access privilege programs, and authorizing the quota-based fishing permits and licenses at issue in FFI's Fifth Amendment takings claim. *See* S. REP. NO. 109-229, at 1 (2006); Magnuson–Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, sec. 303A, 120 Stat. 3575, 3586–93 (2007) (codified at 16 U.S.C. § 1853a); *see also* 16 U.S.C. § 1853(d) (2000) (individual fishing quotas). FFI's claim involves four different permitting, licensing, and endorsement requirements for fishing in the Management Areas: (1) Federal Fisheries Permit; (2) License Limitation Program license; (3) Amendment 80 Quota Share permit; and (4) fishery endorsements. *See* J.A. 73 ¶ 11.

First, a Federal Fisheries Permit (FFP) is required for a vessel to fish in the Management Areas. *See* 50 C.F.R. § 679.4(b)(1) (2021). The Fisheries Service issues FFPs to particular vessels, for a particular time period, and for specific types of authorized operations within the Management Areas. *Id.* § 679.4(b)(1)–(3). "An FFP . . . is not transferable or assignable and is valid only for the vessel for which it is issued." *Id.* § 679.4(b)(6). And although an FFP is necessary for any fishing activity in the Management Areas, it does not grant harvest privileges on its own. *See generally id.* § 679.4(b).

Second, a License Limitation Program (LLP) license is also required for a vessel to harvest or process fish in the Management Areas. *Id.* § 679.4(k)(1)(i). Each LLP license designates the specific areas that may be fished, the specific categories of fish that may be harvested, the specific manner in which vessels may be operated, and the specific types of vessel and gear that may be utilized. *Id.* An LLP license may be transferred from one fishing company to another, so long as certain eligibility criteria are met. *Id.* § 679.4(k)(7). However, each LLP license may be transferred only once per calendar year, *id.* § 679.4(k)(7)(vi), and an LLP license's various designations are not severable, *id.* § 679.4(k)(7)(viii). An LLP license is also a prerequisite for obtaining a Quota Share (QS) permit. *See id.* § 679.4(o)(1)(vi).

Third, the QS permits relevant here are associated with the Amendment 80 (A80) limited access privilege program. After Congress amended the amended Magnuson–Stevens Act, the Fisheries Service promulgated regulations to implement the A80 limited access privilege program, allocating fishing quotas for six species of non-pollock groundfish in the BSAI management area: Pacific ocean perch, Atka mackerel, flathead sole, Pacific cod, rock sole, and yellowfin sole. *See* Fisheries of the Exclusive Economic Zone Off Alaska; Allocating Bering Sea/Aleutian Islands Fishery Resources; American Fisheries Act Sideboards, 72 Fed. Reg. 52,668, 52,671 (Sept. 14, 2007) [hereinafter A80 Final Rule] (codified at 15 C.F.R. pt. 902 and 50 C.F.R. pt. 679). The A80 program seeks to remedy wasteful discarding of certain harvested fish by allocating a portion of available groundfish to certain vessels, allowing vessel operators to "fish in a slower and less wasteful fashion," increase efficiency, and reduce waste. *See* A80 Final Rule at 52,668–70. Each year, the Fisheries Service "allocate[s] an amount of [A80] species available for harvest," and then assigns a portion of that allowable catch—i.e., Quota

Share—to each A80 vessel based on their historic participation in the A80 program. *See id.* at 52,671–72.

The Fisheries Service approves certain vessels—designated A80 vessels—for participation in the A80 program, *see id.* at 52,671, and non-A80 vessels are prohibited from catching A80 species, 50 C.F.R. § 679.7(o)(1)(i) (2021). An A80 QS permit may be assigned to either a particular A80 vessel or a particular LLP license. 50 C.F.R. § 679.4(o)(1)(ii) (2021). The A80 QS permit may be transferred, but the conditions applicable to such a transfer will depend on whether the permit is assigned to a vessel or an LLP license, *see id.* § 679.90(e), and the Fisheries Service must approve any request to transfer an A80 QS permit, *id.* § 679.90(f).

Fourth, a vessel must obtain a fishery endorsement to engage in commercial fishing activities. 46 U.S.C. § 12113(b)(1); *see also id.* § 12102(a) (specifying that "a vessel may engage in a trade only if the vessel has been issued . . . an endorsement for that trade"). A fishery endorsement is issued only to vessels that satisfy certain statutory requirements—e.g., compliance with a "built in the United States" requirement. *Id.* § 12113(a); *see also* 46 C.F.R. § 67.21(b)(1). If, at any point, a vessel ceases to comply with applicable requirements, its fishery endorsement becomes invalid. 46 U.S.C. § 12135.

## B. Procedural Background

FFI is a collection of related Washington State companies. J.A. 73 ¶ 10. Until 2014, FFI owned two vessels— *American No. 1* and *U.S. Intrepid*—with the necessary fishery endorsements, FFPs, LLP licenses, and A80 QS permits to operate in the Management Areas. *See* J.A. 73 ¶ 10; J.A. 73–74 ¶ 11; J.A. 78 ¶ 28; J.A. 81 ¶¶ 39–40. FFI's LLP licenses and A80 QS permits were issued pursuant to the Magnuson–Stevens Act.

In November 2014, FFI retained Dakota Creek Industries, Inc. (Dakota Creek) to construct a new fishing vessel—*America's Finest*. J.A. 80 ¶ 37. In early 2017, the Fisheries Service approved (1) FFI's purchase of an LLP license and a QS permit (originally associated with another fishing vessel known as *Defender*) from another fishing company. J.A. 81 ¶ 39. FFI also obtained approval to (1) designate *America's Finest* as a replacement vessel for *American No. 1* and transfer the latter's LLP license and A80 QS permit to the former and (2) designate *American No. 1* as a replacement vessel for *Defender* and transfer the latter's LLP license and A80 QS permit to the former. J.A. 81–82 ¶¶ 40–41; J.A. 73–74 ¶ 11. However, in March 2017, Dakota Creek informed FFI that foreign steel was used in the construction of *America's Finest*. J.A. 82 ¶ 42. Accordingly, the Coast Guard, which oversees vessel documentation, determined that *America's Finest* was noncompliant with 46 U.S.C. § 12113(a)'s "built in the United States" requirement and therefore ineligible to receive the requisite fishery endorsements to operate in the Management Areas. J.A. 67–77 ¶ 23; J.A. 83 ¶ 43.

Dakota Creek then lobbied Congress for a waiver to the "built in the United States" requirement for *America's Finest*, J.A. 83 ¶ 44, and Congress subsequently passed the Frank LoBiondo Coast Guard Authorization Act of 2018, Pub. L. No. 115-282, 132 Stat. 4192 (Coast Guard Act). Section 835 thereof granted a waiver so that *America's Finest* could harvest and process fish in the Management Areas. *See id.* sec. 835(a)–(b). However, section 836 of the Coast Guard Act limited the amount of A80 groundfish and non-A80 fish that FFI's vessels could collectively harvest and process in the Management Areas. *See id.* sec. 836(a)(1)(A)–(B). These "sideboards," which do not apply to harvesting outside of the GOA management area and expire in 2024, restrict FFI's three vessels (i.e., *U.S. Intrepid*, *America's Finest*, and *American No. 1*), any replacement vessels thereto, and any vessel assigned the

*Defender*'s LLP license, to the collective, historic harvesting and processing figures of those vessels from 2012 to 2017. *See id.* sec. 836(a)–(b). FFI interprets these sideboards as restricting its three vessels to the *U.S. Intrepid* and *American No. 1*'s historical figures, depriving FFI of any increased capacity from acquiring the *Defender*'s LLP license and QS permit and building *America's Finest. See* J.A. 93–94 ¶¶ 70–71.

FFI then filed a claim with the Claims Court, alleging that the Coast Guard Act's sideboards amounted to an unlawful, uncompensated taking that (1) deprived FFI of the full scope of its rights under its endorsements, licenses, and permits; and (2) devalued its vessels. J.A. 71–72 ¶¶ 3–5. The government moved to dismiss. *Fishermen's Finest, Inc. v. United States*, 155 Fed. Cl. 576, 591 (2021). Relying on our decisions in *Conti* and *American Pelagic*, the Claims Court dismissed FFI's complaint for failure to state a claim, concluding that: (i) the express language of the Magnuson–Stevens Act indicated "congressional intent not to confer any right, title, or interest, and to preserve the government's authority to revoke privileges enjoyed in" fishing licenses and permits issued pursuant to the Magnuson–Stevens Act, *id.* at 601–02; (ii) FFI's licenses and permits did not have the essential characteristics of compensable property—i.e., transferability and the right to exclude others, *id.*; and (iii) FFI "do[es] not have a cognizable property interest in the right to conduct commercial fishing activities in any part of the EEZ," *id.* at 606–07.

FFI timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I

When reviewing a dismissal for failure to state a claim, we "must accept as true all the factual allegations in the complaint and we must indulge all reasonable inferences

in favor of the non-movant." *Conti*, 291 F.3d at 1338 (citation omitted). Whether the Claims Court properly dismissed a complaint for failure to state a claim is a question of law that we review independently and without deference. *Id.* For Fifth Amendment takings claims, "[w]e review de novo the existence of a compensable property interest." *Hardy v. United States*, 965 F.3d 1338, 1344 (Fed. Cir. 2020).

## II

The Fifth Amendment to the United States Constitution provides that private property "shall not be taken for public use without just compensation." U.S. Const. amend. V, cl. 4. Courts must evaluate two prongs in determining whether a government action constitutes a taking: "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (collecting cases).

As to the first prong, "[i]t is well settled that existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Id.* at 857 (internal quotation marks omitted). However, where a "claimant fails to demonstrate the existence of a legally cognizable property interest, the court[']s task is at an end." *Am. Pelagic*, 379 F.3d at 1372. Our precedent establishes that fishing permits and licenses issued pursuant to the Magnuson–Stevens Act are revocable privileges, rather than compensable property interests, *see Conti*, 291 F.3d at 1341–42, and there is no inherent, cognizable property interest in the use of vessels for fishing within the EEZ, *see Am. Pelagic*, 379 F.3d at 1382–83.

In *Conti*, a claimant alleged that the government limited his rights under a swordfish permit, issued pursuant to the Magnuson–Stevens Act, without compensation. 291 F.3d at 1339. We observed *inter alia* that the Magnuson–Stevens Act expressly states that any limited access authorization system "shall not create, or be construed to create, any right, title, or interest in or to any fish," 16 U.S.C. § 1853(d)(3)(D), (d)(2)(A) (2000), and that the government may limit or terminate any particular fishing permit system "without compensation to holders of any limited access system permits," *id.* § 1853 (d)(2)(A). *See Conti*, 291 F.3d at 1342 & n.6. Moreover, the "absence of crucial indicia of a property right"—i.e., transferability and exclusivity—"coupled with the government's irrefutable retention of the right to suspend, revoke, or modify" fishing permits "compel[led] the conclusion" that fishing permits are revocable privileges, rather than compensable property. *See id.* at 1341–42.

Likewise in *American Pelagic*, we rejected an argument that the "government could not refuse to issue or reissue, revoke, modify, or suspend" fishing privileges issued pursuant to the Magnuson–Stevens Act absent the commission of "specified 'offense[s]' or for failure to pay a penalty." *See* 379 F.3d at 1373–74. The claimant alleged that Congress "took" its right to use its vessel for fishing by canceling its fishery permits and authorization letter. *Id.* at 1374 n.15. We explained, however, that the Fisheries Service's regulations "preserved the government's right to deny or sanction the permits and authorization letter issued" by specifically stating that nothing precluded "sanction or denial of a permit for reasons not relating to enforcement." *Id.* at 1374 (quoting 15 C.F.R. § 904.301(a) (1987)). In sum, under *Conti* and *American Pelagic*, FFI has no cognizable property interest in its fishing permits, licenses, and endorsements.

## III

Attempting to overcome our precedent in *Conti* and *American Pelagic*, FFI argues those cases were decided before Congress amended the Magnuson–Stevens Act in 2007, which, in FFI's view, altered the nature of fishing endorsements, licenses, and permits such that they now bear the traditional hallmarks of compensable property[2]—i.e., transferability, exclusivity, and irrevocability. *See* Appellants' Br. 4, 23–31, 34–39; Appellants' Reply Br. 2; Oral Arg. 2:48–3:36. We disagree. Consistent with our holdings in *Conti* and *American Pelagic,* the language of the amended Magnuson–Stevens Act and the Fisheries Service's regulations maintain FFI's LLP licenses and QS permits as non-compensable, revocable privileges.[3]

Even though *Conti* and *American Pelagic* were decided before the Magnuson–Stevens Act was amended, neither the amended Magnuson–Stevens Act nor the Fisheries Service's subsequent regulations governing limited access privilege programs (e.g., the A80 program) made FFI's fishing licenses and permits compensable property. The amended Magnuson–Stevens Act continues to expressly

---

[2] "The rights to sell, assign, or otherwise transfer are traditional hallmarks of property." *Conti*, 291 F.3d at 1341.

[3] Although FFI contends that it has a cognizable property interest in "the combination of licenses, permits and endorsements, including Amendment 80 QS and Amendment 80 LLPs," Appellants' Reply Br. 10, its substantive arguments focus on the characteristics of its LLP licenses and QS permits, *see*, *e.g.*, Appellants' Br. 20 (arguing that "FFI has a compensable property interest in its permits and licenses"). FFI presents no arguments as to how its fishing endorsements, other than being a prerequisite for using LLP licenses and QS permits, impart compensable property rights.

state that "[l]imited access privilege, quota share, or other limited access system authorization . . . *shall not create*, or be construed to create, *any right, title, or interest* in or to any fish before the fish is harvested by the holder." 16 U.S.C. § 1853a(b)(4) (2012) (emphasis added). Authority makes clear that such language suggests that the Act does not create a Fifth Amendment property interest in the licenses and permits to engage in fishing. *See Conti*, 291 F.3d at 1342 n.6 (stating that although the Magnuson–Stevens Act's "disavowal of the permit's creation of 'any right, title, or interest in . . . any fish' . . . is not facially commensurate with a statement that the law does not create any right, title, or interest in the *permit*[,] . . . to the extent that the right to harvest and thus possess fish in the fishery is inextricably tied to the possession of a permit, the language certainly suggests that" the Act "creates no property right in the permit." (emphases modified and first ellipses in original) (quoting 16 U.S.C. § 1853(d)(3)(D) (2000)); *see also United States v. Fuller*, 409 U.S. 488, 489, 494 (1973).

Moreover, the Magnuson–Stevens Act's statutory language—both before and after amendment—informs the public's expectations and forms the "existing rule or background principle of federal law that inhered in [FFI]'s title to [its] vessel[s]." *See Am. Pelagic*, 379 F.3d at 1379 (cleaned up) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029–30 (1992)). Indeed, FFI concedes that compensable property rights, if any, must be established by the Magnuson–Stevens Act. *See* Oral Arg. at 9:28–10:02. As with the statutory language of the Magnuson–Stevens Act that we analyzed in *Conti* and *American Pelagic*, there is nothing in the plain language of the amended Magnuson–Stevens Act that creates a compensable property right in fishing licenses or permits. On its face, § 1853a(b)(4)'s "express statutory language . . . prevent[s] the formation of a protectable property interest." *See Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005).

Similarly, consistent with the Magnuson–Stevens Act, the Fisheries Service's regulations expressly provide that LLP licenses and A80 QS permits "are *neither a right to the resource nor any interest* that is subject to the 'takings' provision of the Fifth Amendment to the U.S. Constitution." *See* 50 C.F.R. § 679.4(a)(8) (2017) (emphasis added); *see also* 50 C.F.R. § 679.4(a)(8) (2006) (same). Indeed, the Department of Commerce's regulatory notice regarding the A80 program reiterated that QS permits "confer[] a privilege, not a property right, and [are] not subject to compensation." *See* A80 Final Rule at 52,696–97. The Fisheries Service's regulations further undercut any expectation that FFI might have to compensable interests in its fishing licenses or permits. In sum, the amended Magnuson–Stevens Act and the Fisheries Service's regulations make clear that fishing permits and licenses are not compensable. *See Conti*, 291 F.3d at 1341–42; *Am. Pelagic*, 379 F.3d at 1373–76.

We reject FFI's contention that, despite the Magnuson–Stevens Act's clear expression that there are no compensable property rights in fishing permits and licenses, its LLP licenses and A80 QS permits are compensable because, under the amended Magnuson–Stevens Act, they are transferable, exclusive, and irrevocable. *See* Appellants' Br. 20–34 (citing 16 U.S.C. § 1853a(b)(2),(c)(7)). As an initial matter, we note that FFI concedes that, if its LLP licenses and QS permits are freely revocable by the government, they confer no cognizable property interests.[4] *See* Oral Arg. 3:55–4:30, 8:10–8:49. The Magnuson–Stevens Act—both before and after amendment—decrees that fishing permits and licenses are so revocable: "[L]imited access privilege[s], quota share[s], or other limited access system authorizations . . . may be *revoked, limited, or modified at any time* in accordance with this chapter" and "*shall*

---

[4]    *See* discussion *supra* note 3.

*not confer any right of compensation* to the holder . . . if it is revoked, limited, or modified." 16 U.S.C. § 1853a(b)(2)–(3) (2012) (emphasis added); *accord id.* § 1853(d)(3)(B)–(C) (2000) (similar); *see also Conti*, 291 F.3d at 1341–42; *Am. Pelagic*, 379 F.3d at 1373–74.

FFI's contention that 16 U.S.C. § 1853a(b)(2)'s "in accordance with this chapter" language limits the government's power to revoke, modify, or limit licenses and permits issued under the Magnuson–Stevens Act to specifically enumerated situations involving enforcement or overall management is unconvincing. *See* Appellants' Reply Br. 15–18. We read that language to mean that licenses and permits may be revoked, modified, or limited in a manner that is not inconsistent with the Magnuson–Stevens Act. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1942–43 (2022) (interpreting "in accordance with" in a different statute to mean consistent with). In fact, the legislative history for the 2007 amendments to the Magnuson–Stevens Act indicate that Congress intended to "re-affirm existing law relating to [individual fishing quotas] that a [limited access privilege program] is a permit that may be *revoked or limited at any time* without right to compensation." S. REP. NO. 109-229, at 26 (emphasis added). Congress's suggestion that "permit[s] . . . *could also* be revoked or modified for any failure to comply with the program or if the system is found to have jeopardized the sustainability of the stock or the safety of fishermen" suggests that revocation or modification is not limited to such circumstances. *See id.* (emphasis added); *see also, e.g.*, 16 U.S.C. § 1858(g) (setting forth permit sanctions for certain prohibited acts). Simply put, there is no express language or other indication of congressional intent to limit Congress's legislative power to revoke, modify, or limit privileges granted under the Magnuson–Stevens Act. *See Conti*, 291 F.3d at 1341–42; *Am. Pelagic*, 379 F.3d at 1373–74. As such, the Coast Guard Act's limitation on FFI's aggregate catch totals did not amount to any taking

of compensable property.[5]  Because FFI concedes that the revocability issue is dispositive, Oral Arg. 3:55–4:30, 8:10–8:49, we need not reach its arguments regarding the remaining characteristics of compensable property—i.e., transferability and exclusivity.[6]

We are also unpersuaded by FFI's argument that subjecting its fishing licenses and permits to taxation or liens by the Internal Revenue Service (IRS) or liens under maritime law overrides Congress's express intent that such licenses and permits are non-compensable property.  *See* Appellants' Br. 39–41.  The IRS taxes both non-compensable, government-issued privileges and compensable property.  *See Internal Revenue Serv. Notices of Levy on Undelivered Com. Dep't Fishing Quota Permits*, 19 U.S. O.L.C. 23, 1995 WL 944019, at \*4 (1995) ("Despite the recognition that *licenses and permits are* considered[] privileges and *not rights* . . . courts nonetheless treat them as property subject to levy. . . ." (emphases added)).  In other

---

[5]    Furthermore, consistent with our regulatory analysis in *American Pelagic*, the A80 regulations at issue here expressly state that "quota shares, permits, or licenses represent *only a harvesting privilege that may be revoked or amended* subject to the requirements of the [Magnuson-Stevens Act] and other applicable law."   50 C.F.R. § 679.4(a)(8) (2017) (emphasis added).  Under the A80 program, the government retained the right to revoke, suspend, or modify fishing privileges. *See id.* § 679.4(a)(7), (8); *see also* 15 C.F.R. § 904.300 (2017); *id.* § 904.1(c)(24).

[6]    FFI separately argues that because Congress singled it out for special restrictions, this case implicates fairness concerns underlying the Takings Clause.  *See* Appellants' Br. 37–39.  But such considerations may go to whether a property was "taken," not to whether it was cognizable property in the first place. *See E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998).

words, taxation does not transform non-compensable privileges—e.g., fishing endorsements, LLP licenses, and QS permits—into compensable property, contrary to congressional intent. FFI's reliance on maritime law, specifically, *Gowen, Inc. v. F/V Quality One*, 244 F.3d 64 (1st Cir. 2001), is also unavailing. In *Gowen*, the First Circuit held that federal fishing permits under the Magnuson–Stevens Act are "appurtenances" of a vessel and subject to maritime liens due to the value such permits contribute to the vessel. *See id.* at 67. *Gowen*, however, was silent as to whether the permits are themselves compensable property. Regardless, value alone does not transform a revocable, non-compensable privilege into a compensable property interest. *See Fuller*, 409 U.S. at 493 (holding that "the value added to fee lands by a revocable permit authorizing the use of neighboring lands that the Government owns" is not compensable under the Fifth Amendment); *see also Conti*, 291 F.3d at 1340–41 (holding that revocable fishing permits under the Magnuson–Stevens Act are not compensable because to hold otherwise would compensate "a claimant for 'the value of a right that the Government . . . can grant or withhold as it chooses'" (alteration in original) (quoting *Fuller*, 409 U.S. at 493)).

In sum, the Magnuson–Stevens Act, as amended, forecloses FFI's claim, and we hold that FFI's LLP licenses and A80 QS permits were subject to revocation, modification, or limitation by Congress. The Coast Guard Act's sideboards that Congress placed on FFI's vessels are consistent with the revocable nature of FFI's fishing licenses and permits. We therefore agree with the Claims Court that FFI did not possess any cognizable property interests in its LLP licenses and A80 QS permits.

IV

FFI also argues that the Coast Guard Act's sideboards deprived it of a property interest in using its vessels to harvest and process fish. Appellants' Br. 45–46. We disagree.

FFI does not have a compensable property interest in using its vessels to harvest and process fish in the Management Areas.

In *American Pelagic*, we rejected a claimant's similar assertion that it had a property right in its fishing permits and authorizations "appurtenant to the use and operation of [its] fishing vessel" to harvest or process fish in the EEZ. 379 F.3d at 1372–73. Because Congress, via the Magnuson–Stevens Act, "assumed 'sovereign rights and exclusive fishery management authority over all fish' in the EEZ," which "indisputably encompasses all rights to fish in the EEZ," the ability to harvest and process fish in the United States' sovereign waters is not a right inherent to vessel ownership, even of permitted, licensed vessels. *Id.* at 1378–79, 1381. The right to fish in the EEZ is not "one of the sticks in the bundle of property rights that [are] acquired with title." *Id.* at 1382–83.

Here, the Coast Guard and the Fisheries Service issued and approved fishing endorsements, LLP licenses, and A80 QS permits that allowed FFI's vessels to harvest and process fish from the Management Areas. Without these government-issued privileges, FFI does not have an inherent right to use its vessels to harvest or process fish in the Management Areas, as FFI itself recognizes. *See* Appellants' Reply Br. 10 ("[I]t is the *combination* of licenses, permits and endorsements, including Amendment 80 QS and Amendment 80 LLPs, which *allows FFI to fish* in [the Management Areas]." (second emphasis added)); Appellants' Br. 7 (contending that "new entrants *must acquire* an existing vessel, license, and endorsements" (emphasis added)). As such, FFI does not have a compensable interest as to the use of its vessels to harvest and process fish in the Management Areas. *See Am. Pelagic*, 379 F.3d at 1381 ("Because the right to use the vessel to fish in the EEZ was not inherent in its ownership of the [vessel], [claimant] did not suffer the loss of a property interest for purposes of the Takings Clause when its [fishing] permits were revoked.");

*see also Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed. Cir. 1993) (concluding that the right to sell assault weapons in domestic commerce was merely a "collateral interest," incidental to gun ownership, that was not protected by the Fifth Amendment and not "a right inherent in [claimant]'s ownership of [property]").

Although the Coast Guard Act limits FFI's ability to use its vessels, FFI may nonetheless continue to operate its vessels in the Management Areas. Any expectation that FFI might have had in using its vessels to harvest or process fish arise from government-issued permits, licenses, and endorsements that were always subject to revocation, modification, and limitation. *See Am. Pelagic*, 379 F.3d at 1382–83.

## CONCLUSION

We have considered FFI's remaining arguments and do not find them persuasive. For the foregoing reasons, the Claims Court did not err in dismissing FFI's takings claim for lack of a cognizable property interest. We therefore affirm the Claims Court's dismissal.

**AFFIRMED**